# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| CAROL M. WISDOM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:06CV93MLM |
| | ) | |
| JO ANNE BARNHART, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of

Jo Anne B. Barnhart ("Defendant") denying the application of Carol M. Wisdom ("Plaintiff") for

Social Security benefits under Title II of the Social Security Act, 42 U.S.C. § § 401 et seq., and for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§1381

et seq.  Plaintiff has filed a brief in support of the Complaint. Doc. 14.  Defendant has filed a brief in

support of the Answer. Doc. 15. The parties consented to the jurisdiction of the undersigned United

States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). Doc. 7.

## I.
## PROCEDURAL HISTORY

On December 11, 2003, Plaintiff filed applications for disability benefits alleging a disability

onset date of December 11, 2003 due to lung cancer, high blood pressure, back pain, arthritis, ulcers,

breathing problems and swelling of her hands, feet, and legs.  (Tr. 54-56, 100-102).  Plaintiff's

applications were denied.  (Tr.31-35).  Plaintiff requested a hearing, which was held March, 9, 2005,

before Administrative Law Judge ("ALJ") Julian D. Cosentino.  (Tr. 337-61).   At the hearing

Plaintiff amended her alleged onset date to October 7, 2004.  (Tr. 341).  By decision dated July 27,

2005, the ALJ determined that Plaintiff was not under a disability as defined in the Social Security Act. (Tr. 13-26).

On December 23, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 3-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

### A.  Plaintiff's Testimony:

Plaintiff testified that at the time of the hearing she was 46 years old; that she dropped out of school in the seventh grade; that she can read and write "some things"; that she can read some books; that she cannot see letters and words well; that she can write a simple note; and that when she was in school she was in special education classes. (Tr. 340-41, 353).

Plaintiff testified that she worked as a waitress several times; that her last employment was as a waitress; and that she stopped working as a waitress on October 13, 2004, because she would "lash out at people for no reason and different stuff like that" and because she had problems physically doing the job. Plaintiff further testified that prior to her last job as a waitress she performed home health work for approximately four to five years and that she stopped performing the home health work "because of different health problems and stuff" including "shortness of breath, a continuous swelling of the ankles all the way to the knees, chronic back pain, and leg pain." Plaintiff testified that she also worked at a gas station pumping gas and performed factory work and trash pick up; that she worked at the gas station approximately sixteen months; that she stopped working at the gas station because of stress at home and on the job; that she worked performing trash pick up for approximately four months; and that she stopped doing trash pick up because "[i]t was too hard to lift the bags." (Tr. 342-44).

When asked by the ALJ to describe her medical problems Plaintiff testified, "I have bipolar where I get angry easily for no reason, lash out at people, stressed, anxiety, panic attacks, chronic, major depression, I don't get along with people." Plaintiff also testified she has problems with shortness of breath; that she had lung cancer in 2003 and had the upper lobe of her lung removed; that she uses an inhaler four times a day; and that she has pain in her side from the lung surgery. Plaintiff further testified that she has problems with her back; that she hurt her back on two different jobs while lifting; that she has "bone degeneration in [her] back, sciatic nerve damage"; and that she "just suffer[s] a lot with [her] back." (Tr. 344-46).

Plaintiff further testified that she does not have side effects from her medications; that her medications help her sleep and help control her "irritation, anger"; and that since she has been on medication she gets frustrated and "go[es] off on people" "maybe one, two times a week." (Tr. 348-49,354).

Plaintiff said that at the time of the hearing she was living with her daughter; that she helped put dishes in the dishwasher and pick up her clothes; that she did not go to the store with her daughter; that she drives; that she visits family; that sometimes when she visits family she goes on her own; that she does not watch her grandchildren very often; that she makes her bed; that she sometimes helps her daughter cook; and that she does not have "a whole lot of problems" when she "does those things." (Tr. 350-51). Plaintiff said that she watches television, reads, and talks on the telephone; that she has a problem with concentration; that this problem affects her when she is reading and watching television; and that she is not able to watch an entire television program. (Tr. 353).

Plaintiff also testified that the most she can stand at one time is one hour; that after an hour of standing her back hurts, her legs hurt, and she gets pain in her back and legs; that she has problems

sitting for long periods of time; that she can sit for thirty minutes before she has to change positions; that her most comfortable position is laying down; that she has to lay down during the day because her legs swell; that this happens every day; that when she lays down she does so for "about five, ten minutes, something like that." (Tr. 351-52).

**B.    Testimony of the Vocational Expert:**

Michael Lala, a vocational expert ("VE"), testified at the hearing. The following hypothetical question was posed to the VE by the ALJ:

> If I were to find that [Plaintiff], because of her back problem and lung problem, was restricted to lifting no more than 20 pounds which could be done occasionally, frequently to lift items up to ten pounds, but would have to change positions because she couldn't stay in a set position for long periods of time after about a half hour of being on her feet she'd have to sit down, after sitting for half hour, 45 minutes she'd have to stand up because of back discomfort, [] are there jobs that could be done if those were the only ... limitations I were to find in environments where there wouldn't be a lot of exposure to pollutants because of her lung and breathing problems? Those were the limitations. Are there jobs that could be done?

(Tr. 255-56).

The VE responded that pursuant to this hypothetical Plaintiff could perform her past work as a home health care worker as she described it in the record. (Tr. 356). The VE testified that the exertional demand in the Dictionary of Occupational Titles for home health worker and care worker is medium; that the job of companion is light; and that there would be jobs available as an information clerk, microfilm mounter, mail clerk, and officer helper or messenger. (Tr. 356-57).

In regard to problems which persons with post-traumatic stress disorder or panic attacks would have on the job the VE testified that such people would "los[e] it; they would not be able to focus; they would take excessive breaks; they would be absent from the "worksite too many times and too often"; "they can't even leave their house ... because of anxiety"; they would have "problems focusing once they got to work" including taking breaks and "[b]eing inefficient in terms of getting

things done." The VE also testified that "there would be outbursts that might affect their ability to function on jobs or disrupt other employees" and the person "might act out inappropriately." (Tr. 357-59).

The ALJ posed second hypothetical question to the VE as follows:

[I]f I were to find that [Plaintiff] had an anxiety disorder, post-traumatic stress disorder, and panic attacks that was under some level of control with medication or therapy or both such that she could focus on certain[] jobs that had simpler unskilled type of instructions in lower stress settings, is there anything that would interfere with the fact that she had a anxiety problem that would keep her from working on the jobs that you mentioned in response to [the] first series of questions?

(Tr. 359-60).

The VE responded that pursuant to such a hypothetical, Plaintiff's anxiety problem would not keep her from working. Upon further questioning by the ALJ the VE testified that if Plaintiff's assessment of her ability to function were credited there would not be any jobs which she could perform. (Tr. 360).

Plaintiff's attorney asked the VE, "[i]f we would hypothesize that [Plaintiff] would have episodes two to three times per week where she'd be getting very frustrated and lashed out at people and coworkers, would that allow for any substantial and gainful employment?" The VE responded, "[n]o, if they occurred on the job, if they were random in nature." (Tr. 360).

### III.
### MEDICAL and OTHER RECORDS

Plaintiff's school records reflect that in 1969 when she was twelve years old her WISC score was 72 and her IQ was 67. (Tr. 118).

On October 6, 2003, Plaintiff was seen at University of Missouri Health Care for evaluation of cough with phlegm, right-sided sternal chest pain, and abnormal CT scan findings. Medical records

of this date state that, "[i]n view of the history, physical examination, and the CT scan findings, the differential rests on insidious infection, probably TB, and malignancy." (Tr. 291).

Records from a chest x-ray performed on October 14, 2003, reflect that an left upper lobe cavitary lesion was seen. (Tr. 309). A CT scan of the chest performed on this same date showed a left upper lobe cavitary lesion and right kidney lesion, likely a cyst. (Tr. 310) .

Records of University of Missouri Health Care reflect that Plaintiff was seen for follow-up on October 15, 2003, and that physical examination on this date showed Plaintiff was in "no obvious respiratory distress"; that, in regard to her chest, she had bilateral equal air entry and no adventitious sounds; and that, in regard to her extremities, she had no edema, clubbing or cyanosis and had good peripheral pulses. Records reflect that it was "reiterated" to Plaintiff to stop smoking; that it was determined that Plaintiff would have a bronchoscopy; that a pulmonary function study showed mild to moderate obstructive lung defect; and that Plaintiff's diagnosis was cough with history of hemoptysis, chronic smoker and abnormal cavitary lesion in the left lung on CT scan. (Tr. 286-88).

Records reflect that Plaintiff had a bronchoscopy on October 22, 2003, and that the indications for the procedure were a left upper lobe cavitary lesion on a CT scan. (Tr. 315, 319). Records reflect that on this same date Plaintiff had a chest x-ray done post-bronchoscopy and that the impression from the x-ray was a persistent small cavitary lesion left upper lobe. (Tr. 308).

Clinic notes reflect that on October 30, 2003, Plaintiff was seen for complaints of back pain. (Tr. 283).

Records of the Ellis Fischel Cancer Center reflect that Plaintiff was seen on November 5, 2003, for evaluation of her left upper lobe lesion and that on November 10, 2003, Plaintiff's diagnosis was lung mass. (Tr. 271).

Records of University of Missouri Health care reflect that on November 11, 2003, reflect that Plaintiff was scheduled to undergo left video-assisted thoracoscopic surgery. (Tr. 274). Records further reflect that Plaintiff was admitted to the University of Missouri Hospital and Clinics on this same date; that a left upper lobe wedge biopsy and left upper lobotomy, mediastinal lymph node dissection, and left lower lobe wedge biopsy were performed; and that the diagnosis was left upper lobe non-small cell lung cancer. (Tr. 326-27).

Records of the Ellis Fischel Cancer Center reflect that Plaintiff was seen for follow-up on December 4, 2003, and that the diagnosis was lung carcinoma. David Dean, M.D., reported on December 4, 2003, that Plaintiff was "doing well, status post left upper lobe lobectomy for a stage 1 non-small lung cancer. My plan is to see her back in 3 months with a chest x-ray for a routine cancer surveillance." (Tr. 237, 239)

A radiology report dated December 8, 2003, states that Plaintiff had a lumbar spine x-ray and that this x-ray showed small hypertrophic spurs at the anterolateral margins of the vertebral bodies. (Tr. 255). A CT scan done on the same date showed "mild uniform posterior bulges throughout and borderline spinal canal narrowing at L3-L4 and L4-L5 and "minor degenerative changes involving facet joints at L4-L5 and minimal at other levels. (Tr. 256).

Records from Phelps County Regional Medical Center reflect that a bone density study performed on December 23, 2003, was normal. (Tr. 254).

John Demoralis, M.D., examined Plaintiff on February 19, 2004, at the request of the Social Security Administration. Dr. Demoralis's report states that Plaintiff said that she had back pain "at least six years"; that "the pain level [was] about an 8 or 9"; that the "pain [was] in the low back" and "[a]t times it will go down both upper legs." Dr. Demoralis further reported that when questioned in regard to arthritis pain, Plaintiff indicated that, "her legs and ankles will swell, her knees will hurt,

hands will hurt, '7 or 8'." Dr. Demoralis' diagnosis included left lung cancer – moderately differentiated adenocarcinoma, post left upper lung lobectomy, COPD, back pain, hypertension, depression, history of peptic disease, minor venous insufficiency legs, status post appendectomy, and an approximate 45 pack/year history of tobacco use which was ongoing. (Tr. 244- 47)

Records of the Ellis Fischel Cancer Center reflect that Plaintiff was seen for follow-up on March 18, 2004. (Tr. 240).

Records of Salem Memorial District Hospital reflect that Plaintiff had an upper GI series on October 13, 2004, the impression of which was "non-specific coarse gastric and duodenal mucosa" and "filling defect, narrowing with coarse mucosa in the region of distal duodenum/proximal jejunum and may represent underlying mass and stricture." (Tr. 233)

John Pearson, D.O, reported that he saw Plaintiff on October 15, 2004, for complaints of stomach pain. Dr. Pearson's records state that his diagnosis was diverticulitis and abdominal pain. (Tr. 228). On October 18, 2004, Dr. Pearson reported that his diagnosis was duodenal stricture or mass. He recommended that Plaintiff proceed with a surgery consultation "with all haste." (Tr. 229).

In a letter to Dr. Pearson, dated October 19, 2004, Sherry Phippen, M.D., reported that she reviewed Plaintiff's upper GI series and that it showed non-specific changes of the gastric and duodenal mucosa, and "question of a filling defect in the region of the distal duodenum and proximal jejunum." Dr. Phippen recommended possible endoscopy and small bowel follow-through or CT scan. (Tr. 207).

Records of St. John's Clinic-Rolla-Imaging reflect that Plaintiff had a CT scan of the abdomen and pelvis on October 20, 2004, and that the impression from the CT scan was: "1. Minimal shotty retroperitoneal adenopathy. All of these densities measure less than 0.5 cm. 2. Right renal cyst. 3. Metastatic disease is not apparent. 4. There is a small questionable nodular density in the anterior

medial aspect of the lingular lobe. Consider CTT evaluation of the chest for further assessment." (Tr. 191).

Records of Pathways CBH.Inc. ("Pathways") reflect that Plaintiff was evaluated on November 11, 2004, and that her presenting problems were depression, panic, PTSD, and mania; that her appearance, psychomotor activity, speech quality and quantity, impulse control, continuity and orientation of her thought process, memory, thought content, and somatic symptoms including sleep, appetite, and weight, were within normal limits; that her manner/attitude was irritable, angry and hostile; that her mood was dysphoric/irritable; that her affect was constricted, flat, and blunted; that her thought process was "slow/hesitant thinking"; that her energy/libido was decreased; that her attention/concentration was poor; and that her judgment/reason and insight were fair. Records from Pathways further state that at the time of the evaluation Plaintiff was employed part-time in the service field and that she had been regularly employed. Plaintiff's diagnosis on this date was, at Axis I, post-traumatic stress disorder, chronic agorophobia with panic attacks, and major depressive disorder; at Axis II, borderline intellectual functioning; at Axis II, hypertension, lung cancer in remission; at Axis IV, economic problems, primary support group problems; and at Axis V, a GAF of 55.[1] (Tr. 214-22).

Records of the St. John's Clinic reflect that Plaintiff was seen on November 17, 2004, and that she felt well on that date. (Tr. 230).

---

[1]     Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

Fauzzia Iqbal completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on December 15, 2004. Dr. Iqbal reported that Plaintiff was fair in regard to understanding, remembering and carrying out simple job instructions and in demonstrating reliability. He reported that she was good in the area of personal appearance and that her ability was poor to none in regard to behaving in an emotionally stable manner, relating predictably in social situations, understanding, remembering and carrying out complex and detailed job instructions, following work rules, and in all areas of occupational adjustments. Dr. Iqbal noted that Plaintiff suffered from a learning disability, "borderline intellectual functioning," "maybe even mental retardation." Dr. Iqbal also noted that Plaintiff exhibited poor communication skills and comprehensive skills; that Plaintiff followed simple once daily instructions on medications; and that "complex detailed titration schedules" were difficult for Plaintiff. (Tr. 225-26).

Records of the Phelps County Regional Medical Center Emergency Room reflect that Plaintiff was seen on January 14, 2005, with complaints of pain in her legs, a sudden onset of chest pain, shortness of breath and a feeling of warmth moving up into her neck and that her diagnosis was chest wall pain. (Tr. 196).

Dr. Pearson's records reflect that Plaintiff was seen on January 21, 2005, at which time her diagnosis included hypertension, COPD, emphysema, and irritable bowel syndrome, and that an upper respiratory infection was suspected. Dr. Pearson stated that the plan was for Plaintiff was to change from Albuterol to Combivent, and to take Bentyl for the irritable bowel syndrome. (Tr. 190).

Tom Martin, M.D., reported that he saw Plaintiff on February 9, 2005, for evaluation of chest pain. Dr. Martin reported that Plaintiff's lungs were clear; that her heart showed a regular rhythm with no clinical cardiomegaly; and that there were no murmurs or gallops appreciated. Dr. Martin's

diagnosis included chest pain unknown, essential hypertension, history of smoking abuse, history of carcinoma of the lung, and rectal bleeding of unknown etiology. (Tr. 188-99).

Plaintiff was seen for follow-up by Dr. Iqbal on February 23, 2005. The diagnosis on this date included at Axis I, bipolar II, post-traumatic stress disorder chronic, agoraphobia with panic attacks; at Axis II, borderline intellectual functioning; at Axis III, COPD, hypertension, and lung cancer in remission; at Axis IV, economic, education, housing, psychoscocial, social environmental, and primary support group problems; and at Axis IV, a GAF of 45. (Tr. 203-204).

Plaintiff was seen by Dr. Iqbal on August 23, 2005. Dr. Iqbal noted on this date that Plaintiff was denied disability; that she needed a letter; and that Plaintiff was "[s]table on current medications, residual worry. Medications/anxiety control." Dr. Iqbal's notes also state that Plaintiff "[n]eeds letter. 2-3x's per week may have difficulty and falling & staying asleep, feels not tired enough to do so at times at night. Some depressive episodes. Some mood swings, irritability, feeling stressed about the disability denial." Dr. Iqbal's diagnosis included chronic insomnia. (Tr. 332). Dr. Iqbal also wrote on August 23, 2005:

> This is to state that [Plaintiff] has been under my care for psychiatric treatment for the last few months. In my opinion she is permanently disabled. Through out the course of her treatment she has been compliant with medications & doctor visits. It appears that notes were misinterpreted in regards to her compliance and her disability denied. Statements regarding compliance & doctor visits in the treatment plan are standard interventions for all psychiatric clients. Please reconsider her case in light of the above.

(Tr. 331).

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is

determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § § 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the

Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by

substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect

relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health and Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health and Human Servs., 902 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health and Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health and Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for

the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Rautio, 862 F.2d at 180; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## VI.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is

substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ erred in finding that she was not disabled under Listing 12.05C in that he improperly considered her reported IQ scores of 67 and 72[2] and that Dr. Iqbal's diagnosis of February 2005 supports her IQ score of 67. Plaintiff contends that the ALJ's own findings demonstrate that Plaintiff meets the non-IQ portion of Listing 12.05C and that she has more than slight or minimal limitation or work-related function thus meeting Listing 12.05C. Plaintiff further contends that the ALJ's conclusion that she has raised a family and lived independently is "totally without foundation." Doc. at 20. Plaintiff also argues that the ALJ incorrectly found that she can perform past relevant work.

## A. Plaintiff's Intellectual Functioning:

After considering Plaintiff's medical records the ALJ concluded that Plaintiff had medically determinable severe impairments. The ALJ then considered whether Plaintiff's impairments, either alone or in combination, met any of the Listings. The ALJ found as follows in this regard that:

> After considering all of the claimant's impairments individually and in combination, the combined clinical findings from her impairments do not medically meet or medically equal the criteria for any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. This includes Listing 13.14 for lung cancer, which requires non-small-cell carcinoma - inoperable, unresectable, recurrent, or metastatic disease to or beyond the hilar nodes or small-cell oat cell carcinoma; Listing 1.04A for spinal disorders, which requires limited motion of her spine and motor loss accompanied by sensory or reflex loss, for her physical impairments. For her mental impairments, she does meet the criteria for Listing 12.04 for affective (mood) disorder, 12.05 for mental retardation or 12.06 for anxiety. Regarding Listing 12.05C, she does not exhibit the requisite deficits in adaptive functioning.

---

[2]     Plaintiff's Brief is somewhat confusing in regard to her criticism of the ALJ's consideration of her IQ scores. In any case, the court will address the extent to which the ALJ considered Plaintiff's IQ scores in terms of the applicable Regulations and case law.

Because the claimant does not medically meet or medically equal the criteria of a listed impairment and she does not have a combination of impairments that are equivalent in severity (not in mere numbers) to a listed impairment, her disability cannot be established on the medical facts alone. (citation omitted).

(Tr.20).

Additionally, the ALJ noted that Plaintiff contended that her school records show IQ scores of 72 and 67 and that she meets the criteria of Listing 12.05. The ALJ concluded, however, that Plaintiff's "level of adaptive functioning, as indicated by her home life and work experience is inconsistent with the deficits in adaptive functioning required to meet Listing 12.05. (Tr. 23).

The Eighth Circuit has recently held in regard to the Listings that:

[T]he Commissioner must sequentially consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether he has a medically severe impairment that meets the duration requirement, and (3) whether his impairment meets or equals one of the impairments listed in Appendix 1 to 20 C.F.R. Part 404 and meets the duration requirement. See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987); Goff v. Barnhart, 421 F.3d 785, 789-90 (8th Cir. 2005); 20 C.F.R. § 404.1520. If the claimant satisfies each of these three elements, the claimant is conclusively presumed to be disabled. Bowen, 482 U.S. at 141. If the impairment is not one that meets or equals one of the listings, the Commissioner must determine whether the impairment prevents the claimant from performing work that he has performed in the past or whether he is able to perform other work in the national economy in view of his age, education, and work experience. Id. at 141-42.

Karlix v. Barnhart, Slip Op. No. 05-3832 at *5 (8th Cir. Aug. 3, 2006).

The ALJ's analysis is consistent with the procedure described in Karlix because after concluding that none of Plaintiff's allegedly disabling conditions met a Listing either alone or in combination, he proceeded to consider the requirements of her past relevant work. Goff, 421 F.3d at 790.

Section 12.00(a) lists mental disorders in diagnostic categories, which include, among others, mental disorders (§ 12.02), affective disorders (§ 12.04), mental retardation (§ 12.05), anxiety related disorders (§ 12.06), and personality disorders (§ 12.08). In particular, Listing 12.05C sets forth the requirements of the required severity for a person to be found disabled based on mental retardation. The claimant must have at least one of the following: the claimant must depend on others for his or her personal needs, the claimant must have a valid verbal, performance, or full scale IQ of 59 or less, a "valid verbal performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function," or a "valid verbal performance, or full scale IQ of 60 through 70 resulting in at least two of the following," marked restriction of activities of daily living, marked difficulties in maintaining social functioning, concentration, persistence, or pace or repeated episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C). In regard to IQ scores the Eighth Circuit has held that "IQ scores must be valid, that the Commissioner need not rely exclusively on IQ scores, and that the Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole." Clay v. Barnhart, 417 F.3d 922, 929 (8th Cir. 2005) (citing Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001) (Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998)). "An ALJ may reject IQ scores if they are inconsistent with the rest of the record." Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998)).

The IQ of Plaintiff in the matter under consideration was determined to be both 67 and 72 when she Plaintiff was approximately twelve years old. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §112.00D.10, states that:

> IQ test results must also be sufficiently current for accurate assessment under 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16.

Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.

Also, the Eighth Circuit has held that "person's IQ is presumed to remain stable over time in the absence of any evidence of a change in the claimant's intellectual functioning.[3] Clay, 417 F.3d at 929 (citing Muncy, 247 F.3d at 734). See also Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir.1985) (holding that absent contrary evidence, an IQ test taken after the insured period correctly reflects claimant's IQ during the insured period); Guzman v. Bowen, 801 F.2d 273, 275 (7th Cir.1986) (holding that the claimant had a low IQ during onset of disability in 1979 rather than just when first IQ tested in 1982); Luckey v. Department of Health & Human Servs., 890 F.2d 666, 668-69 (4th Cir.1989) (holding that an ALJ could assume claimant's IQ remained relatively constant in absence of evidence showing a change in claimant's intelligence functioning).

Where a claimant has several IQ scores, the Eighth Circuit holds, for purposes of Listing 12.05, "the regulations do not address which IQ score is appropriate when multiple tests have been given." Miles v. Barnhart, 374 F.3d 694, 700 (8th Cir. 2004) (holding that the ALJ did not err in rejecting the claimant's IQ score of 70 when she received higher scores on other tests and her education and vocational history were inconsistent with the adaptive function requirements of Listing 12.05).

In Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006),the Eighth Circuit has recently addressed Listing 12.05C in regard to a claimant whose IQ is in the 60 to 70 range and held that "to meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60

---

[3]     The Eighth Circuit's rulings in regard to the stability of IQ scores do not address the current Regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00D.10.

through 70; (2) an onset of the impairment before age 22; *and* (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." (emphasis added). In any case, "[t]o meet a listing, an impairment must meet all of the listing's specified criteria." Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990) ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify.").

Based on 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00D.10 Plaintiff's IQ scores when she was approximately 12 years old do not establish that she meets the IQ requirement of Listing 12.05C; she was less than 16 when she was tested and at the time of the hearing she was 46 years old; certainly more than 4 years elapsed since Plaintiff had been tested. Moreover, even assuming, arguendo, that her IQ scores are valid, the score of 72 is not within the range provided in Listing 12.05C; the ALJ could have properly relied on that score. See Miles, 374 F.3d at 700. Further, assuming, arguendo, that Plaintiff's IQ score of 65 is valid for purposes of Listing 12.05C, in order to establish that she meets this Listing Plaintiff must also show that she has a physical or other mental impairment imposing an additional and significant work-related limitation of function. In regard to the this requirement, the court in Maresh held:

> The third requirement of Listing 12.05C is that the claimant has a physical or other mental impairment imposing an additional and significant work-related limitation of function, i.e., a "more than slight or minimal" effect on the ability to perform work. Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir.2000) (quoting Cook v. Bowen, 797 F.2d 687, 690 (8th Cir.1986)).

Id. at 900.

Consistent with Listing 12.05C, the ALJ considered what effect if any Plaintiff's intellectual functioning has on her ability to work. (Tr. 18). In particular the ALJ considered that Dr. Iqbal reported on December 15, 2004, among other things that:

Plaintiff has no useful ability to function in making occupational adjustments including following work rules because she could not comprehend work rules, relating to co-workers because she is easily angered, dealing with the public because she does not like crowds, use of judgment because she spent money irresponsibly, interacting with supervisors because she is very agitated and is unable to receive corrections, dealing with work stresses, she does not comprehend well enough to function independently and does not focus well enough to maintain attention and concentration.

(Tr. 17).

Consistent with the requirements of § 404.1520(a) and the third requirement of Listing 12.05C, the ALJ considered Plaintiff's functional limitations as evidenced by activities of daily living; her social functioning; her persistence or pace; and her deterioration or decompensation in work or work-like settings. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

In regard to Plaintiff's daily activities the ALJ considered that Plaintiff uses a dishwasher and picks up after herself; that she goes for drives with her daughter; that she visits with friends and cooks; and that she is "only able to watch television 30 minutes to an hour at a time." The ALJ also considered that:

> [Plaintiff] is able to clean, shop, cook, travel to unfamiliar places, pay her bills, maintain her residence, care appropriately for her grooming and hygiene, use telephones and directories and similar activities without significant limitation, as demonstrated by her reports and testimony. She has been performing these activities independently, appropriately and effectively. She has been initiating and participating in these activities independent of supervision or direction.

> The record reflects no relevant limitations in her activities of daily living. She experienced a period of exacerbation of symptoms in October 2004, quit her job and started receiving mental health treatment.

(Tr. 19).

The court notes additionally that Plaintiff testified that she does watch her grandchildren, although not very often; that she makes her bed; that she visits family on her own; and that she does not have a lot of problems when performing daily activities. While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, a plaintiff's daily

activities can nonetheless be seen as inconsistent with Plaintiff's subjective complaints of a disabling impairment. See Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992). Additionally, pursuant to a determination of whether the requirements of Listing 12.05C are met, IQ scores "should be examined to assess consistency with daily activities." Johnson, 390 F.3d at 1070. The court finds that the ALJ's factual findings in regard to Plaintiff's daily activities are consistent with Plaintiff's testimony at the hearing and are supported by evidence on the record.

The ALJ also considered that the "record does not indicate that [Plaintiff's] symptoms will persist for the requisite 12-month period, if she were to take her medications and attend her psychotherapy sessions.[4] The ALJ concluded that Plaintiff responded well to her medications and to her psychotherapy. (Tr. 18). Indeed, the record reflects that Dr. Iqbal reported in August 2005 that Plaintiff was stable on her current medications. Moreover, Plaintiff testified that her medications help her irritation and anger and that she does not have side effects from medications. Conditions which can be controlled by treatment are not disabling. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. Additionally, the absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible. See Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). As such, the court finds that the ALJ correctly considered the effect of Plaintiff's medications on her allegedly disabling conditions and that the ALJ's decision in this regard is supported by substantial evidence.

---

[4]     20 C.F.R. § 414.909 states that "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement."

The ALJ also considered that Plaintiff worked with her symptoms and that the record does not reflect that her condition worsened or deteriorated. Despite Plaintiff's alleged mental and physical impairments, as noted by the ALJ, Plaintiff was able to work a full-time job in September 2004. Moreover, Plaintiff's earnings record reflects that in 2000 she earned $16,192.52; in 2002, she earned $10,631.99; in 2002, she earned $17,452.50, and in 2003, she earned $14,655. (Tr. 88, 95). "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148049 (8th Cir. 2001). "Working generally demonstrates an ability to perform a substantial gainful activity." Goff, 421 F.3d at 792 (citing Nabor v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994)). 20 C.F.R. § 404.1574(a) provides that if a claimant has worked, the Commissioner should take this into consideration when determining if the claimant is able to engage in substantial gainful activity. Moreover, when a claimant has worked with an impairment, the impairment cannot be considered disabling without a showing that there has been a significant deterioration in that impairment during the relevant period. See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). Section 404.1574(a)(1) further states that work which a claimant is forced to stop or reduce below the substantial gainful activity level after a short time because of his impairment is generally considered an unsuccessful work attempt. As such, the court finds that the ALJ correctly considered that Plaintiff's impairments, including her alleged mental impairments, did not prevent her from working and that the ALJ's decision in this regard is supported by substantial evidence.

The ALJ further considered, pursuant to 20 C.F.R. §404.1520a(c)(3), whether Plaintiff has been able to interact appropriately and communicate effectively with other individuals. In this regard the ALJ concluded that:

> At the time Plaintiff quit her waitress job because she was feeling angry and agitated. She remains able to get along with family members. She does not have a

history of altercations, evictions, firings, avoidance of interpersonal relationships or social isolation. She has demonstrated ability to initiate social contacts with others, communicate clearly with others, and interact and actively participate in group activities. She still appears able to go out and interact with the public, responding appropriately to persons in authority and can exhibit cooperative behaviors.

[Plaintiff's] limitations in social functioning are "less than marked." She experienced a period of extreme agitation and depression, but her symptoms improved when she started receiving treatment.

(Tr. 19).

The ALJ also considered that on February 23, 2005, Dr. Iqbal reported, in addition to having bipolar disorder, post-traumatic stress disorder and agoraphobia with panic attacks and borderline intellectual functioning, that Plaintiff had a GAF of 45. The court notes that a GAF of 45 is serious. See n. 1. In November 2004, however, Plaintiff was diagnosed with a GAF of 55 which represents a finding of mild symptoms. Id.

Pursuant to Listing 12.05C and § 404.1520(a), the ALJ considered Plaintiff's adaptive functioning and functional limitations and stated that:

The claimant alleges that her IQ scores from school reflect cognitive functioning consistent with mental retardation or borderline intellectual functioning. Her treating psychiatrist reported that she was in the borderline range of intellectual functioning and limited in her abilities to understand, remember and complete detailed or complex work instructions. If this was the only evidence regarding her cognitive and adaptive functioning, she would be limited to unskilled work. However, she is 46 years old, raised a family and has lived independently without apparent difficulty. She worked as a home health aide, where she took vital signs using a stethoscope, blood pressure cuff and thermometer, charted vital signs and completed paperwork. She worked as a waitress, where she took orders and handled money. She was the assistant manager of a gas station, where she reported gas tank gauge readings, made bank deposits, handled cash and was responsible for paperwork. These activities reflect cognitive abilities and adaptive functioning inconsistent with a limitation to unskilled work.

(Tr. 24).

Although Plaintiff contends that the record does not reflect that she has performed paperwork in her past employment, Plaintiff reported that her job at a gas station required that she do paperwork.

25

(Tr. 155). While Plaintiff contends that the record does not specifically reflect that she raised a family and/or that she made bank deposits, Plaintiff did testify that she has a family, including a daughter and that prior to moving in with her married daughter, about three months prior to the hearing, she lived alone in a house. She also acknowledged that she does watch her grandchildren, although not very often. (Tr. 349). In any case, an "arguable deficiency in opinion-writing technique," does not require a court to set aside an administrative finding when that deficiency had no bearing on the outcome. Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Robinson, 956 F.2d at 841. To the extent that the ALJ may have erred in his reference to facts on the record, the court finds that these errors have no bearing on the outcome of this case.

The ALJ concluded that Plaintiff's limitations in social functioning are "less than marked"; that she "is able to sustain focused attention sufficiently long for her to timely complete tasks commonly found in work settings"; that "her memory, as demonstrated by her testimony, is relatively unimpaired"; that she completes tasks in a reasonable period and does not require assistance to complete these tasks"; that she "has no relevant limitations in persistence or pace"; that in regard to episodes of decompensation, Plaintiff had one episode and has lived with stressors all her life; and that she has no limitations in concentration, persistence or pace.

In conclusion, the court finds that the ALJ's analysis of Plaintiff's alleged mental retardation or borderline intellectual functioning is consistent with the Regulations and case law. The court further finds that substantial evidence supports a finding that Plaintiff does not meet *all* of the criteria specified in Listing 12.05C including both the IQ portion and the non-IQ portion of this Listing. See Johnson, 390 F.3d at 1070. As such. the court finds that the ALJ's decision that Plaintiff is not disabled based on Listing 12.05C is supported by substantial evidence on the record and that the ALJ's decision in this regard is consistent with the Regulations and case law. See Masesh, 438 F.3d

at 899; Clay, 417 F.3d at 1255; Johnson, 390 F.3d at 1070; Muncy, 247 F.3d at 734; Dunlap, 649 F.2d at 638.

**B.    The Opinion of Dr. Iqbal:**

Plaintiff contends that her lower IQ score is supported by the findings of Dr. Fauzia Iqbal based on his diagnosis.  As set forth in detail above, above, Dr. Iqbal, who treated Plaintiff  for several months, completed an evaluation of Plaintiff in December 2004 and again in February 2005. On this later date he noted that she had borderline intellectual functioning.  Also, in August 2005,after the date of the ALJ's decision Dr. Iqbal opined that Plaintiff was permanently disabled.

The opinions and findings of a plaintiff's treating physician are entitled to considerable weight. Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000)(citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)).  However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing  Matthews v. Bowen, 879 F.2d 422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data).  Where diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight.  Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987).  An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).

Upon discrediting Dr. Iqbal's December 2004 report the ALJ noted that the person described by Dr. Iqbal would not have been able to live independently, as Plaintiff did; that the person described by Dr. Iqbal would not have been a good candidate to manage her benefits but Dr. Iqbal opined that Plaintiff could manage her benefits; and that while Dr. Iqbal said that Plaintiff was unable to keep appointments, the record does not reflect how many appointments Plaintiff missed in the two months Dr. Iqbal treated Plaintiff. (Tr. 22). The ALJ also considered that Dr. Iqbal further reported that Plaintiff can follow simple instructions, can maintain her personal appearance, has demonstrated reliability, and able to manage benefits. (Tr. 17). As such, the ALJ cited specific reasons for discrediting Dr. Iqbal's report and noted inconsistencies which undermine Dr. Iqbal's conclusions. Therefore, the ALJ's analysis in this regard is consistent with the Regulations and case law. See Chamberlain, 47 F.3d at1494; Prosch, 201 F.3d at 1013; Veal, 833 F.2d at 699.    While Dr. Iqbal opined in his February 2005 report that Plaintiff had a GAF of 45 and that she had borderline intellectual functioning, this report states no more than conclusions at each Axis. Additionally, in August 2005[5] Dr. Iqbal opined that Plaintiff was permanently disabled. A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Moreover, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Chamberlain, 47 F.3d at 1494; Barrett v. Shalala,

---

[5]        Dr. Iqbal's letter of August 2005 was written after the ALJ issued his opinion.

38 F.3d 1019, 1023 (8th Cir.1994) (citing <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir.1991));

<u>King v. Heckler</u>, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory

statements of total disability by a treating physician where the ALJ has identified good reason for not

accepting the treating physician's opinion, such as its not being supported by any detailed, clinical,

diagnostic evidence).

As such, the court finds that the ALJ properly discounted Dr. Iqbal reports. Additionally, the

court finds that the ALJ's decision is supported by substantial evidence in regard to his consideration

of Dr. Iqbal's opinion.

**C.      Plaintiff's Ability to Perform Past Relevant Work:**

Plaintiff's brief also suggests that the ALJ incorrectly found that she can perform her past

relevant work.

20 C.F.R. § 404.1560 states in relevant part in regard to a claimant's ability to perform past

relevant work:

(b) Past relevant work ...

(2) Determining whether you can do your past relevant work. We will ask you for information about work you have done in the past. We may also ask other people who know about your work. (See § 404.1565(b).) We may use the services of vocational experts or vocational specialists, or other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work. In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

(3) If you can do your past relevant work. If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy. ...

(c) Other work.

(1) If we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work.

Also, the Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. A "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work

setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id.

Upon making an RFC assessment an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. See Masterson,363 F.3d at 737. Pursuant to this requirement, the ALJ in the matter under consideration found that Plaintiff's RFC is as follows: "Occasionally lifting or carrying more than 20 pounds at a time, frequently lifting or carrying objects weighing more than 10 pounds, standing, walking or sitting more than 6 hours in a regular 8-hour work-day, or working in a polluted environment." (Tr. 25-26).

As stated above, an ALJ is required at Step 4 of the sequential analysis to determine whether a claimant's RFC prevents her from performing her past relevant work. In particular, the ALJ in the matter under consideration found:

> The claimant is now a 47 year-old individual who attended school into the 7th grade and on the job Certified Nurse's Aide training. Her Work History Report, Disability Report and her testimony show that her work experience as a home health worker, waitress, assistant manager of a gas station and laborer meet the requirements of past relevant work. The vocational expert classified her past relevant work as a home health care worker, as she described this work, as work performed at a light exertional capacity. She reported on Exhibit E, p. 52 that this work mainly involved sitting with the customer because she was on a restriction to not lift more than 20 pounds.

(Tr. 24).

Resort to the Medical-Vocational Guidelines is only appropriate when there are no non-exertional impairments that substantially limit the ability of Plaintiff to perform substantially gainful activity. If a claimant is found to have non-exertional impairments that diminish his or her capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. Robinson, 956 F.2d at 839. Additionally, an ALJ posing a hypothetical to a VE is not

required to include all of a claimant's limitations, but only those which he finds credible. Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d at 180. The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobana, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question sets precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes evidence supporting the ALJ's decision. Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

The Eighth Circuit recently held as follows in Grisson v. Barnhart, 416 F.3d 834, 837 (8th Cir. 2005) :

> "Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir.2004) (citing Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir.1996)). The hypothetical question must include all the claimant's impairments supported by substantial evidence in the record as a whole. Id. (citing Pickney v. Chater, 96 F.3d 294, 296 (8th Cir.1996)). However, the hypothetical question need only include those impairments which the ALJ accepts as true. Rappoport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir.1991).

> [The claimant] contends the ALJ's first hypothetical to the vocational expert was inaccurate and incomplete, because it did not reference her borderline intellectual functioning and other mental impairments, including her poor ability to deal with work stress, to function independently, and to maintain attention and concentration. "We have previously concluded that *borderline intellectual functioning*, if supported by the record as it is here, *is a significant nonexertional impairment that must be considered by a vocational expert*." Lucy v. Chater, 113 F.3d 905, 908 (8th Cir.1997).

> We have explained: "While borderline intellectual functioning may not rise to the level of a disability by itself, a claimant is nevertheless entitled to have a vocational expert consider this condition along with [her] other impairments to determine how it impacts upon the claimant's residual functional capacity." Id. at 909 (citing Pickney, 96 F.3d at 297). We also have noted it is of no consequence whether the claimant's borderline intellectual functioning pre-dated her application; the vocational expert still

must consider it along with the claimant's other impairments. See Pickney, 96 F.3d at 297 n. 3.

"'[B]orderline intellectual functioning, if supported by the record as it is here, is a significant nonexertional impairment that must be considered by a vocational expert.'" Id. (quoting Lucy v. Chater, 115 F.3d 905, 908 (8th Cir. 1997).

While the ALJ concluded that Plaintiff has borderline intellectual functioning, the ALJ did not include this non-exertional limitation in Plaintiff's RFC nor did he include her borderline intellectual functioning in a hypothetical to the VE. (Tr. 25). The ALJ posed a hypothetical to the VE which reflected all of Plaintiff's limitations as found credible by the ALJ, with the exception of borderline intellectual functioning.[6] Because the ALJ did not include this non-exertional limitation in Plaintiff's RFC and in the hypothetical to the VE it cannot be said that the ALJ's finding that Plaintiff can perform her past relevant work is supported by substantial evidence. See Grisson, 416 F.3d at 837; Lauer, 245 F.3d at 703. The court will, therefore, reverse and remand this matter to the ALJ so that the ALJ may pose a hypothetical to a VE which correctly reflects all Plaintiff's limitations which the ALJ found credible including Plaintiff's borderline intellectual functioning.

**IV.**
**CONCLUSION**

The court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4. Upon remand, the ALJ should be directed to fully develop the record in a manner consistent with this court's opinion. *The court stresses that upon reversing and remanding this matter it does not mean to imply*

---

[6]     Plaintiff's attorney posed a hypothetical to the VE which included limitations imposed by Dr. Iqbal in his December 2004 evaluation. The VE testified that if Dr. Iqbal's limitations were found credible Plaintiff would not be able to function in her past relevant jobs. (Tr. 360). The ALJ, however, did not credit Dr. Iqbal's conclusions. As such, the ALJ findings regarding Plaintiff's borderline intellectual functioning are not reflected in any hypothetical to the VE.

*that the Commission should return a finding of "disabled."* The court is merely concerned that the Commissioner's final determination, as it presently stands, is not supported by substantial evidence because the hypothetical posed to the VE did not reflect all of Plaintiff's limitations which the ALJ found credible and as it did not correctly reflect her RFC.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief which Plaintiff seeks in her Brief in Support of Complaint is **GRANTED** in part, and **DENIED**, in part. [Doc. 14]

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will issue contemporaneously herewith remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.

**IT IS FURTHER ORDERED** that upon entry of the Judgment, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.


/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this 31st day of August, 2006.